UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| DANIEL M. THOMAS | § | |
| | § | |
| v. | § | CIVIL NO. 4:22-CV-375-SDJ |
| | § | |
| GRAY TELEVISION GROUP, INC. | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Gray Television Group, Inc.'s Motion to Strike and Objections to Plaintiff's Motion for Summary Judgment Evidence. (Dkt. #38). The parties have fully briefed the motion to strike. (Dkt. #40) (response); (Dkt. #41) (reply). Also before the Court is Defendant Gray Television Group, Inc.'s Motion for Summary Judgment and Brief in Support. (Dkt. #33). The parties have fully briefed the motion for summary judgment. (Dkt. #36) (response); (Dkt. #37) (reply); (Dkt. #39) (sur-reply).

Having considered the briefings, the record, and the applicable law, the Court concludes that Defendant's motion to strike should be granted in part and denied in part. Further, the Court finds that Defendant's motion for summary judgment should be granted.

## I. Background

This is an employment discrimination case brought under the Americans with Disabilities Act ("ADA" or the "Act"). Plaintiff Daniel M. Thomas claims that Defendant Gray Television Group, Inc. ("Gray") discriminated against him in violation of the Act by failing to provide a reasonable accommodation for his disability and ultimately discharging him because of that disability.

Before 2011, while working for a different television network, Thomas received a flu vaccine during an on-air news segment. (Dkt. #36-1 at 3). After the vaccine, Thomas allegedly had a medical reaction that led to myriad symptoms—he claims he began feeling "lethargic," "really tired and worn out," "like a wet bag of garbage," and like he "couldn't get a good breath" and "had the flu." (Dkt. #33 at 13). Thomas reportedly received the flu vaccine several times after that incident and experienced similar reactions each time he was vaccinated. (Dkt. #33-1 at 41); (Dkt. #36-1 at 3). Although Thomas missed some work while he was experiencing the purportedly vaccine-related medical reactions, he was never hospitalized. (Dkt. #33 at 13); (Dkt. #36 at 6).

Then, in 2011, Thomas consulted his sister-in-law, Dr. Jessica Hutchins,[1] "a former obstetrician and gynecologist (OB-GYN) who now practices functional medicine . . . ." (Dkt. #33 at 11); (Dkt. #36 at 6). According to Thomas, Dr. Hutchins diagnosed him with an allergy to two preservatives: polyethylene glycol ("PEG") and polysorbate-80 ("P-80") (collectively, the "Polys"). (Dkt. #36 at 6, 8). There are no medical notes or records of this consultation or diagnosis in the record, however. (Dkt. #33 at 14); (Dkt. #36 at 6). And Thomas does not claim to have ever seen an allergy or immunology specialist to confirm his allergy to the Polys. (Dkt. #33 at 13); (Dkt. #36 at 6).

Following his 2011 consultation with Dr. Hutchins, Thomas began avoiding

[1] Plaintiff originally designated Dr. Hutchins as an expert in this case; however, Plaintiff withdrew that designation. (Dkt. #23, #31). As such, Plaintiff has no expert in this case.

and eliminating all preservatives—including the Polys—from his diet and hygiene products. (Dkt. #36 at 7); (Dkt. #33-1 at 50). Thomas claims that he experienced gastrointestinal issues when he ate anything with added preservatives, including, but not limited to, the Polys. (Dkt. #36-1 at 6). Thomas's last reaction to the flu vaccine occurred in 2011. (Dkt. #33 at 13).

Gray is a television broadcast company that "owns and operates stations in 113 television markets across the country." (Dkt. #33 at 5). Starting in 2019, Thomas worked as a nightside anchor for Gray in its Sherman, Texas broadcasting station. (Dkt. #1 ¶ 5). Just before the onset of the COVID-19 pandemic, Gray promoted Thomas to executive producer, a position that Thomas held together with his anchor role. (Dkt. #1 ¶ 5). As a nightside anchor and executive producer, Thomas's job duties included "anchoring live broadcasts from the station's studio and news desk along with other anchors and on-air personalities, on-site reporting throughout the community, guest interviews, and functioning as a producer" in the newsroom. (Dkt. #33 at 5). He was also tasked with mentoring other news reporters and "interacting with station technicians and support crew." (Dkt. #33 at 5–6).

During the COVID-19 pandemic, Gray took certain actions to protect its employees. (Dkt. #33 at 7–8). Specifically, it encouraged, and in some cases, required social distancing, mask wearing, temperature checks, and isolation following a COVID infection or exposure. (Dkt. #33 at 7). Initially, Gray permitted its reporters to broadcast from their homes—and it even took some test shots at Thomas's home. (Dkt. #33 at 7); (Dkt. #1 ¶ 6). Gray ultimately determined, however, that having

reporters broadcast live from their homes was not in its best business interest. (Dkt. #33 at 7). So, over the course of the COVID pandemic, Gray eventually began requiring some employees to work in person at the news station, rather than from home. (Dkt. #33 at 7); (Dkt. #1 ¶¶ 6, 8). The parties disagree as to the extent Gray followed CDC guidelines during the COVID pandemic and the benefits of Gray's COVID measures. (Dkt. #36 at 4).

On August 16, 2021, Gray issued an employee-wide email expanding its prior COVID vaccination policy. (Dkt. #33 at 9); (Dkt. #36 at 5). Gray's new policy required all employees receive the COVID vaccine by October 1, 2021. (Dkt. #33 at 9); (Dkt. #36 at 5). Under this updated vaccination policy (the "Policy"), "Gray would grant reasonable accommodations or short extensions of the vaccination deadline where warranted." (Dkt. #33 at 9); (Dkt. #36 at 5). To evaluate whether it could grant or deny an employee's accommodation request, Gray analyzed the employee's job duties. (Dkt. #33 at 10).

Thomas emailed Gray's Human Resources department on September 1, 2021, requesting accommodation under the Policy. (Dkt. #33 at 10); (Dkt. #36 at 5). Thomas submitted the required ADA Medical Questionnaire form, which was signed by Dr. Hutchins. (Dkt. #33 at 11); (Dkt. #36 at 5). Because Thomas had already contracted COVID-19 and experienced medical reactions to the flu vaccine in the past, Dr. Hutchins advised Thomas not to obtain the COVID vaccine. (Dkt. #33-5 at 18). Thomas alleges that the Polys were ingredients in the three FDA-approved COVID vaccines at the time. (Dkt. #1 ¶¶ 11, 12).

On September 29, 2021, Gray denied Thomas's request for accommodation because there was "not a reasonable accommodation that would allow Plaintiff to continue in his role without undue hardship on Gray." (Dkt. #33 at 11–12). Gray claims that its decision to deny Thomas's request arose from its determination that it could not reasonably allow any of its anchors to work from home. (Dkt. #33 at 10). In Gray's view, it wanted its news anchors to work in person at the news station so they could interact with others, among other things. (Dkt. #33 at 10). Gray further avers that the high costs associated with purchasing equipment for at-home broadcasting—along with its desire to have a higher quality product that it believed could only be created at the station—militated against allowing its broadcasters to work from home. (Dkt. #33 at 7, 10). Pursuant to the Policy, Thomas, along with the many other employees who declined to obtain the COVID vaccine, was terminated from employment effective October 1, 2021. (Dkt. #33 at 12). This lawsuit followed.

## II. LEGAL STANDARD

### A. Motions to Strike

Summary judgment evidence is subject to the same admissibility standard as trial evidence. *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 508 (5th Cir. 2008). Pursuant to Federal Rule of Civil Procedure 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." If the affidavit fails to meet any of the procedural requirements, a motion to strike that sets forth specific

objections is the proper method for the opposing party to challenge the affidavit. *Rushing v. Kansas City S. Ry. Co.,* 185 F.3d 496, 506 (5th Cir. 1999), *superseded by statute on other grounds, as noted in Mathis v. Exxon Corp.,* 302 F.3d 448, 459 n. 16 (5th Cir. 2002). However, "[t]he rule is settled that on a motion for summary judgment a court will disregard only the inadmissible portions of a challenged affidavit offered in support of or opposition to the motion and will consider the admissible portions in determining whether to grant or deny the motion." *Lee v. Nat'l Life Assurance Co.,* 632 F.2d 524, 529 (5th Cir. 1980).

The determination of "whether a particular affidavit [or declaration] is vague or conclusory is necessarily a fact-bound analysis that will depend on the facts and claims at issue." *Lester v. Wells Fargo Bank, N.A.*, 805 F.App'x 288, 292 (5th Cir. 2020). With this, "[b]road legal or factual assertions in an affidavit [or declaration] that are unsupported by specific facts are generally held to be conclusory," while "more detailed and fact-intensive affidavits [or declarations] can raise genuine issues of material fact that preclude summary judgment." *Id.* (citing *Kariuki v. Tarango*, 709 F.3d 495, 505 (5th Cir. 2013); *Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.*, 922 F.2d 220, 225 (5th Cir. 1991) ("[U]nsupported . . . affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment." (internal quotation marks and citation omitted)); *Fowler v. S. Bell Tel. & Tel. Co.*, 343 F.2d 150, 154 (5th Cir. 1965) (explaining defendants' sworn, conclusory statements that they were acting within

scope of employment did not support summary judgment where unsupported by specific facts).

**B. Motion for Summary Judgment**

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd ex rel. Est. of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). A defendant is entitled to summary judgment if he "identifies a lack of evidence to support the plaintiff's claim on an issue for which the plaintiff would bear the burden of proof at trial," unless the plaintiff proffers "summary judgment evidence sufficient to sustain a finding in plaintiff's favor on that issue." *Smith v. Harris Cnty.*, 956 F.3d 311, 316 (5th Cir. 2020) (citation omitted).

Because Federal Rule of Civil Procedure 56 requires that there be no "genuine issue of *material* fact" to succeed on a motion for summary judgment, "the mere existence of *some* alleged factual dispute" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (first emphasis omitted). A fact is "material" when, under the relevant substantive law, its resolution might govern the outcome of the suit. *Id.* at 248. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citing *Anderson*, 477 U.S. at 248). When a movant shows that the nonmovant failed to proffer sufficient evidence to establish an essential

element of its claim, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Courts consider the evidence in the light most favorable to the nonmovant, yet the nonmovant may not rely on mere allegations in the pleading; rather, the nonmovant must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial." *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000). Further, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (citation omitted). Thus, the nonmovant must cite the evidence that it contends supports its opposition to the motion for summary judgment. *See* FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

## III. DISCUSSION

### A. Defendant's Motion to Strike Summary Judgment Evidence

The Court will first review Gray's motion to strike, (Dkt. #38), prior to considering the motion for summary judgment, (Dkt. #33), "because it attacks the available evidence before the Court under Federal Rule of Civil Procedure 56(c)." *Nucor Corp. v. Requenez*, 578 F.Supp.3d 873, 903–04 (S.D. Tex. 2022). Gray asserts

that certain portions of the Thomas affidavit (the "Affidavit"), (Dkt. #36-6), which Thomas offered in support of his response in opposition to Gray's motion for summary judgment, (Dkt. #36), should be stricken because they contain hearsay, statements that cannot be made on personal belief, and statements that contradict prior deposition testimony, (Dkt. #38 at 3–8). The Court will review each objection in turn.

**i. Objections to evidence related to disability**

***Declaration Paragraph Eight***. Paragraph eight of the Affidavit describes Thomas's actions and changes following his diagnosis from Dr. Hutchins. (Dkt. #36-6 ¶ 8). Gray objects to the entire paragraph for two separate reasons.

First, Gray objects to the initial statement that describes Dr. Hutchins's diagnosis on the grounds it is inadmissible hearsay. Under the rules of evidence, an affidavit must be made on personal knowledge. FED. R. EVID. 602. Here, Thomas submits his own affidavit in which he asserts that he "was diagnosed by my doctor, Dr. Hutchins, as having an allergy to PEG and polysorbate-80." (Dkt. #36-6 ¶ 8). But there is no evidentiary support for this statement. Indeed, Thomas has proffered no records reflecting the diagnosis, and Dr. Hutchins's own testimony equivocates as to whether she diagnosed him with an allergy to the Polys or was merely in the process of ruling out other potential issues. *Compare* (Dkt. #33-2 at 15) (answering she had a conversation with Thomas when asked if she ever diagnosed Thomas with an allergy to the Polys), (Dkt. #33-2 at 22) (explaining Thomas's reaction could have been to ingredients beyond the Polys like eggs), (Dkt. #33-2 at 33) (answering "no, not necessarily no. We just didn't know" when asked if it was her opinion at the time the

medical questionnaire was submitted that Thomas was allergic to the Polys) *to* (Dkt. #36-2 at 5) (answering "Yeah, I mean, the conclusion we came to, you could consider it a diagnosis or not, is that the—either the polyethylene glycol or polysorbate 80, one of those two, caused the reaction or adverse event. So yes that was me" when she was asked if she had "diagnosed [Thomas] with any allergies of anything that was contained in the COVID-19 vaccines").

This assertion concerning Thomas's supposed medical diagnosis is also hearsay. *See Ripple v. Marble Falls Indep. Sch. Dist.*, 99 F.Supp.3d 662, 678 (W.D. Tex. 2015) ("Although Plaintiff's description of his medical *symptoms* is within his personal knowledge and is not hearsay, Plaintiff's own recounting of his medical *diagnoses* and his doctor's orders, offered for proof of those diagnoses and orders, constitutes inadmissible hearsay." (emphasis added)). "A diagnosis comes from a doctor who then communicates that diagnosis to its patient, as the passive construction in [Thomas's] affidavit implies." *Spindle v. CKJ Trucking, LP*, No. 4:18-cv-818-SDJ, 2020 WL 1283519, at *3 (E.D. Tex. Mar. 18, 2020). The doctor's out-of-court statement of Thomas's diagnosis is not subject to an exception. *See id.*; *see e.g.*, *Portis v. Grand Trunk W.R. Co.*, 28 F.3d 1214, 1994 WL 362110, at *5 (6th Cir. 1994) (per curiam) (unpublished table decision) ("In this case, defendant was not trying to admit statements made by plaintiff for the purposes of treatment or diagnosis but rather was trying to admit the medical opinions and diagnoses of doctors who had examined plaintiff. Because these opinions were not statements made for the purposes of diagnosis or treatment, they do not fall within the hearsay

exception of Rule 803(4)."); *Scott v. Turner Indus. Grp., LLC*, No. 3:09-cv-872, 2011 WL 5023842, at *2–3 (M.D. La. Oct. 19, 2011) (same); *Holt v. Olmsted Twp. Bd. Of Trustees*, 43 F.Supp.2d 812, 819 (N.D. Ohio 1998 (same). As such, the portion of paragraph 8 reading "After I was diagnosed by my doctor, Dr. Hutchins as having an allergy to PEG and polysorbate-80" is stricken and Gray's objection to this portion is sustained.

Second, Gray objects to (a) Thomas's assertions as to how he changed his diet, toothpaste, and shampoo, and (b) Thomas's claims about his reaction to consuming the Polys, on the ground that Thomas has not presented sufficient evidence to support the symptoms "he experienced were from 'allergic reactions to PEG and polysorbate-80.'" (Dkt. #38 at 6) (quoting Dkt. #36-6 ¶ 8). Here, the Court finds that Thomas's description of his symptoms is within his personal knowledge. *See Ripple*, 99 F.Supp.3d at 678. The portion of paragraph 8 which reads, "I changed my diet to avoid food with these ingredients, and I also changed the toothpaste and shampoo I was using. After making these changes, I did not have the same difficulties with breathing, eating, or missing work that I had experienced previously" is admissible summary judgment evidence. (Dkt. #36-6 ¶ 8). Therefore, Gray's objection to the portions of the paragraph which describe Thomas's change in behavior and his reactions is overruled.

Finally, the portion of the paragraph eight that alleges that Thomas's prior allergic reactions were to PEG and polysorbate-80 are stricken as conclusory and unsupported by any evidence. As previously stated, Thomas has presented no evidence

that he was ever diagnosed with an allergy to the Polys. Therefore, any assertion that his prior reactions were caused by an allergic reaction to the Polys is conclusory and unsupported by the evidence. Therefore, Gray's objection to these statements is sustained and the statements are stricken.

***Declaration Paragraph Nine***. Gray objects to the beginning portion of paragraph nine which reads, "Prior to my allergy diagnosis," (Dkt. #36-6 ¶ 9), for the same reason that it objected to the testimony regarding a diagnosis in paragraph eight. Plaintiff argues that this statement is not hearsay as it is not being presented for the truth of the matter asserted but is rather being offered to provide a reference point for when certain events occurred. (Dkt. #40 at 6). However, the Court finds that this statement is being offered for the truth that Thomas received a diagnosis. Thus, the statement implicates the same hearsay issues as paragraph eight of the Affidavit. As such, the Court sustains Gray's objection, and the phrase "prior to my allergy diagnosis" is stricken from paragraph nine.

***Declaration Paragraph Ten***. Paragraph ten details why Thomas now avoids ingesting the Polys. (Dkt. #36-6 ¶ 10). Gray specifically objects to the portions that read: "On occasion, I have accidentally ingested products with PEG and/or polysorbate-80, which has caused my throat to swell and restricted my breathing." (Dkt. #38 at 6–7) (brackets removed). Gray argues that these statements amount to a sham affidavit

because Thomas never disclosed throat swelling or restricted breathing during his deposition. (Dkt. #38 at 6–7).

The Court agrees. Under the sham-affidavit doctrine, "a nonmoving party may not manufacture a dispute of fact merely to defeat a motion for summary judgment." *Seigler v. Walmart Stores Tex., L.L.C.*, 30 F.4th 472, 477 (5th Cir. 2022) (quoting *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000)). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* (quoting *Dallas Indep. Sch. Dist.*, 220 F.3d at 386). "When a summary-judgment affidavit is subsequently executed after a prior sworn statement is made, and there is a clear contradiction on a material point without explanation, the 'sham affidavit' doctrine is applied and the contradictory statements in the affidavit should be disregarded." *Tafacory v. Deutsche Bank Nat'l Tr. Co.*, 2020 WL 7658070, at *6 (E.D. Tex. Nov. 6, 2020), *report and recommendation adopted sub nom. Tafacory v. Deutsche Bank Nat'l Tr. Co. as Tr. for Registered Holders of Long Beach Mortgage Loan Tr. 2006-6, Asset-backed Certificates, Series 2006-6*, 2021 WL 958544 (E.D. Tex. Mar. 15, 2021), *aff'd*, 2021 WL 6061556 (5th Cir. Dec. 17, 2021).

As particularly relevant here, the sham-affidavit doctrine applies when "a plaintiff fails to recall specific details at his deposition that he later includes in a summary judgment affidavit." *Coleman v. Chevron Phillips Chem. Co. LP*, No. CV H-23-350, 2024 WL 460248, at *1 (S.D. Tex. Feb. 6, 2024); *see Dallas Indep. Sch. Dist.*,

220 F.3d at 386 (collecting authority); *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) ("[A] district court may find a declaration to be a sham when it contains facts that the affiant previously testified he could not remember.").

During his deposition, Thomas explained that when he ate foods containing preservatives, including the Polys, he would experience diarrhea, inflammation, and "just a feeling of tiredness and . . . lethargy." (Dkt. #33-1 at 53–54). At no point did he testify to "throat swelling or restricted breathing" from consuming the Polys. Therefore, Gray's objection is sustained, and these statements are stricken under the sham-affidavit doctrine.

**ii. Objections to evidence related to notice to Gray of a disability and reasonable accommodations**

Gray objects to portions of paragraphs one, two, six, and seven which all consist of testimony that would support elements two and three of the failure to accommodate claim. (Dkt. #38 at 3–5). *See Palardy v. AT&T Servs., Inc.*, No. 4:21-CV-626-SDJ, 2024 WL 303248, at *4 (E.D. Tex. Jan. 26, 2024) (citing *Feist v. La., Dep't of Just., Off. of the Att'y Gen.*, 730 F.3d 450, 452 (5th Cir. 2013)) (listing the elements of a failure to accommodate claim).

However, as discussed further herein, the Court is granting summary judgment because Thomas is unable to show that he has a disability under the ADA. *See infra* Section III.B. And because Thomas has failed to provide sufficient evidence that he has a disability under the ADA, the Court need not address any other elements of either the failure to accommodate claim or the wrongful termination claim. *See McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 280 (5th Cir. 2000)

("Failure to establish an actual or perceived disability is thus fatal to a plaintiff's case."). Therefore, the Court denies Gray's objections to specific portions paragraphs one, two, six, and seven, as moot.

**B. Defendant's Motion for Summary Judgment**

**i. Applicable provisions of law**

The ADA prohibits discrimination based on an impairment that substantially limits a major life activity—i.e., what the ADA calls a "disability." 42 U.S.C. § 12102 (1)(A). Thomas brings a twofold disability discrimination claim, arguing first that Gray failed to provide Thomas with reasonable accommodations, and that Gray wrongfully terminated his employment due to his alleged disability. *See* (Dkt. #1 ¶ 21). "A failure to accommodate claim has three elements: (1) that the plaintiff was a qualified individual with a disability; (2) that the defendant knew of the plaintiff's disability and consequential limitations; and (3) that the defendant failed to make reasonable accommodations for those limitations." *Palardy*, 2024 WL 303248, at *4 (citing *Feist*, 730 F.3d at 452). To prevail on a claim for wrongful termination or for any other adverse employment action under the ADA, the plaintiff must establish "(1) that he has a disability; (2) that he was qualified for the job he had or the job he applied for; and (3) that he was subject to an adverse employment decision because of his disability." *Id.* at *3 (citing *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014)). Here, Thomas does not satisfy the first element of either claim because he fails to provide sufficient evidence that he has a disability under the ADA. And, as

noted, "[f]ailure to establish an actual or perceived disability is thus fatal to a plaintiff's case." *McInnis*, 207 F.3d at 280.

Relevant here, the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A).[2] "Merely having an 'impairment' does not make one disabled for the purposes of the ADA." *Milton v. Tex. Dep't of Crim. Just.*, 707 F.3d 570, 573 (5th Cir. 2013) (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 195, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) (overruled by statute)). Rather, an individual must (1) have an impairment (2) that substantially limits a major life activity. *Id.*

"[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). These activities are substantially limited when "a person is significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Milton*, 707 F.3d at 573 (citation modified). To determine whether an individual's impairment substantially limits a major life activity, courts consider: "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the

[2] Thomas presented no evidence or argument concerning the ADA's other two definitions of disability: having a record of disability or being regarded as disabled. *See* 42 U.S.C. § 12102(1)(B)–(C); *see also* (Dkt. #36 at 13–15).

permanent or long-term impact of or resulting from the impairment." *Cato v. First Fed. Cmty. Bank*, 668 F.Supp.2d 933, 941 (E.D. Tex. 2009) (citation modified) (citing *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009)).

**ii. Thomas fails to assert a viable ADA claim**

Gray argues that Thomas does not have a disability under the ADA because Thomas cannot demonstrate that he has an allergy to PEG and P-80, Thomas's last alleged allergic reaction occurred in 2011, Thomas fails to allege any substantial limitations, and Thomas lacks expert medical evidence or testimony regarding his disability. (Dkt. #33 at 18–24). In response, Thomas asserts that he has provided testimony that his allergies impacted "major life activities of breathing, eating, and working," as well as evidence from Dr. Hutchins regarding his allergies. (Dkt. #36 at 14–15). Thomas further argues that a jury does not need expert testimony to discern whether he suffered from an allergic reaction or some other condition. (Dkt. #36 at 15).

The Fifth Circuit has reviewed similar fact patterns in two unpublished opinions. *See Hughes v. Terminix Pest Control, Inc.*, No. 23-30617, 2024 WL 3440465 (5th Cir. July 17, 2024) (per curiam); *Pietsch v. FMC Techs., Inc.*, No. 24-20514, 2026 WL 561183 (5th Cir. Feb. 27, 2026) (per curiam). The plaintiffs in both *Hughes* and *Pietsch* claimed to have a "disab[ility] because [their] preexisting health conditions [prevented] them from safely receiving the COVID-19 vaccine, which in turn [prevented] them from working the class of jobs that mandates those vaccines." *Pietsch*, 2026 WL 561183, at *2 (quoting *Hughes*, 2024 WL 3440465, at *1). In *Pietsch*, the plaintiff suffered from a heart condition that prevented him from

obtaining the COVID vaccine. *Id.* at *1. Meanwhile, in *Hughes*, the plaintiffs simply claimed that they could not obtain the COVID vaccine due to "preexisting health conditions." *Hughes*, 2024 WL 3440465, at *1.

In both cases, the Fifth Circuit upheld the district courts' conclusion that the plaintiffs' alleged disabilities were far too attenuated and therefore not protected under the ADA. *See Hughes*, 2024 WL 3440465, at *1; *Pietsch*, 2026 WL 561183, at *1. The Fifth Circuit explained, "In cases where this court has found . . . plaintiff disabled . . . the disability itself *directly limited* the life activity at issue." *Hughes*, 2024 WL 3440465, at *1 (emphasis added) (citing *Mueck v. La Grange Acquisitions, LP*, 75 F.4th 469, 482 (5th Cir. 2023) (finding that an employee's binge drinking substantially impacted the "major life activities of thinking, concentrating, and caring for" oneself)).

Both *Hughes* and *Pietsch* are directly on point. Simply put, Thomas's disability will only impact major life activities *if* he takes the COVID vaccine. Indeed, "the last time he had a reaction tied to his alleged allergy was in or about 2011." (Dkt. #33 at 13); (Dkt. #36 at 6). Thomas attempts to edge around this issue by claiming that his alleged allergies impact "his major life activities of breathing, eating, and working." (Dkt. #36 at 14). As an initial matter, the Court need not determine whether the alleged allergies actually impact Thomas's major life activities because all potential impacts are entirely dependent on Thomas's intravenous exposure to PEG and P-80—i.e., Thomas's taking the COVID-19 vaccine. Without taking the COVID-19 or flu vaccine, his alleged allergies do not impact major life activities. *See*

(Dkt. #33-1 at 54–55) (explaining, during his deposition, that his allergy impacted his ability to work because of vaccine mandates and acknowledging that if he avoids consuming the Polys he is "fine," and maintains a day-to-day ability to work and function).

This line of indirect causal connection was rejected in both *Hughes* and *Pietsch*. As Judge Willett noted in his concurrence in *Pietsch*, "[e]ven after Congress recalibrated the threshold in 2008, the statute preserved a core requirement: the impairment itself must do the limiting." *Pietsch*, 2026 WL 561183, at *3 (Willett, J., concurring). Like the plaintiffs in *Pietsch* and *Hughes*, "[Thomas's] theory proceeds by indirection—a causal chain in which the alleged limitation arises only after multiple intervening steps. His [allergies] prevent[] vaccination; the lack of vaccination prevents him from holding the same job; therefore, his condition substantially limits a major life activity." *Id.* For reasons the Fifth Circuit has already articulated, Thomas's attenuated argument fails.

But even if *Hughes* and *Pietsch* did not apply and Thomas's alleged disability did not directly hinge on taking the COVID-19 vaccine, Thomas fails to present a genuine issue of material fact pertaining to his alleged disability. Again, the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). Thus, to survive summary judgment, Thomas must present evidence showing that he (1) has an impairment (2) that substantially limits a major life activity. *Milton*, 707 F.3d at 573.

First, Thomas fails to provide a genuine issue of material fact that he has an impairment. To start, he fails to present evidence of an actual diagnosis.[3] Indeed, in her testimony Dr. Hutchins equivocates as to whether she diagnosed Thomas with an allergy to the Polys or was merely in the process of ruling out potential issues, such as a reaction to eggs. *Compare* (Dkt. #33-2 at 15) (answering that she had a conversation with Thomas when asked if she ever diagnosed Thomas with an allergy to the Polys), (Dkt. #33-2 at 22) (explaining Thomas's reaction could have been to ingredients beyond the Polys like eggs), (Dkt. #33-2 at 33) (answering "no, not necessarily no. We just didn't know" when asked if it was her opinion at the time the medical questionnaire was submitted that Thomas was allergic to the Polys) *to* (Dkt. #36-2 at 5) (answering "Yeah, I mean, the conclusion we came to, you could consider it a diagnosis or not, is that the—either the polyethylene glycol or polysorbate 80, one of those two, caused the reaction or adverse event. So yes that was me" when she was asked if she had "diagnosed [Thomas] with any allergies of anything that was contained in the COVID-19 vaccines"). Thomas provided no medical records and never consulted a specialist or immunologist. Furthermore, Thomas has never been hospitalized or had an anaphylactic response to the alleged allergy.[4] Thomas voluntarily took the flu vaccine multiple times after his first

[3] Thomas's statement in his affidavit that he was diagnosed with an allergy, (Dkt. #36-6 ¶¶ 8, 9), has been stricken as hearsay. *See supra* Section III.A.i.

[4] Thomas's statement in his affidavit that his throat would close when he ingested something with the Polys, (Dkt. #36-6 ¶10), was stricken under the sham-affidavit doctrine. *See supra* Section III.A.i.

reaction. In short, Thomas has no evidence that he is even allergic to the Polys. He simply has a hunch.

And regarding his alleged gastrointestinal issues, Thomas provides no evidence that such reactions were caused by the same substance allegedly found in the COVID-19 vaccine. Rather, he tries to avoid all added preservatives for his health. (Dkt. #33-1 at 50, 53). While Gray has retained a medical expert, Thomas has retained none. Dr. Hutchins was originally designated as an expert but Thomas withdrew that designation. (Dkt. #23, #31). Therefore, Thomas has no expert to respond to Gray's expert's opinion that Thomas was not experiencing an allergic reaction to the flu shot but rather a common reaction. (Dkt. #33-6 at 5–6). Dr. Hutchins's lay testimony cannot be used as expert testimony. *See Shelton v. Wise*, No. A-07-CA-063 RP, 2009 WL 10699993, at *3 (W.D. Tex. Sept. 1, 2009) (collecting cases from district courts in the Fifth Circuit and other circuits discussing the limited role of a treating physician who has not been designated as an expert). On this scant evidence, no reasonable jury could conclude that Thomas has a disability under the meaning of the ADA. *See Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (quoting *Lawrence v. Fed. Home Loan Mortg. Corp.*, 808 F.3d 670, 673 (5th Cir. 2015)) ("A non-movant will not avoid summary judgment by presenting 'speculation, improbable inferences, or unsubstantiated assertions.'").

Second, Thomas presents no evidence that his alleged impairment substantially limits a major life activity. Thomas merely provides testimony that his alleged allergy impacts major life activities like eating, breathing, and working. (Dkt. #36-6 ¶ 8). To be sure, eating, breathing and working are major life activities.

*See* 29 C.F.R. § 1630.2(i)(1)(i); *Spindle*, 2020 WL 1283519, at *3. However, Thomas provides no testimony or facts to support his allergies substantially *limit* major life activities. Indeed, at one point during his deposition, when asked, "Do those allergies have an impact on your normal day-to-day ability to work and function?", Thomas responded, "As long as I avoid it, I'm fine." (Dkt. #33-1 at 55). Under the "Information to Determine Existence of Disability" section of the medical questionnaire, Dr. Hutchins wrote "N/A" to the following questions: "Does the individual have a physical or mental impairment?"; "Does the individual have a record of a physical or mental impairment?"; "Does the impairment substantially limit a major life activity?" (Dkt. #33-5 at 16).

"Federal courts have routinely dismissed disability discrimination claims when the plaintiff fails to establish that allergies or autoimmune issues substantially limit a major life activity." *Brady v. Evangelical Lutheran Good Samaritan Soc'y*, No. 4:22-CV-841-SDJ, 2024 WL 4445720, at * 6 (E.D. Tex. Oct. 8, 2024); *see, e.g., Mendez v. Ada Cmty. Librs. Bd. of Trs.*, No. 20-CV-589-DCN, 2021 WL 2418004, at *3 (D. Idaho June 11, 2021) ("[H]aving allergies is not generally considered a disability under the ADA." (footnote omitted)); *Wren v. Midwestern State Univ.*, No. 18-CV-60, 2019 WL 3099408, at *9 (N.D. Tex. June 25, 2019) (finding that the plaintiff failed to allege that her allergies substantially limited a daily life activity); *Bowman v. Colonial Pipeline Co.*, No. 22-CV-287, 2023 WL 2908829, at *7 (N.D. Ga. Jan. 4, 2023) (same as to an autoimmune condition), *adopted in part by* 2023 WL 2908826 (N.D. Ga. Mar. 8, 2023); *Land v. Baptist Med. Ctr.*, 164 F.3d 423, 425 (8th Cir. 1999) (explaining that a child's two allergic

reactions to peanuts while at the day care showed a history of impairment, not a history of disability as defined by the ADA).

As such, the Court holds that Thomas does not have a disability under the ADA as a matter of law. Because Thomas has failed to show that he has a disability as a matter of law, which is dispositive of both his claims, the Court need not reach the remaining elements of either claim.

## IV. CONCLUSION

It is therefore **ORDERED** that Defendant Gray Television Group, Inc.'s Motion to Strike and Objections to Plaintiff's Summary Judgment Evidence, (Dkt. #38), is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Defendant Gray Television Group, Inc.'s Motion for Summary Judgment and Brief in Support, (Dkt. #33), is **GRANTED**.

It is further **ORDERED** that Plaintiff Daniel M. Thomas's claims are hereby **DISMISSED** with prejudice.

All relief not granted herein is **DENIED**.

A final judgment will follow.

**So ORDERED and SIGNED this 30th day of September, 2026.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE